IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| VITAL CONNECT, INC., | ) | |
| | ) | |
| Plaintiff-Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | 1:26-cv-428 |
| | ) | |
| BRETT MATRAZZO, | ) | |
| | ) | |
| Defendant-Counterclaim-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Lindsey A. Freeman, United States District Judge.

Vital Connect, Inc. ("VitalConnect") sues one of its former employees, Brett Matrazzo, for breach of contract, asserting that he has breached—and continues to breach—three restrictive covenants contained in a contract he signed with VitalConnect, the Confidential Information and Inventions Assignment Agreement ("Agreement"). It moves for preliminary injunctive relief, *see* Dkt. 4, to enforce the restrictive covenants against Matrazzo to stop him from working for one of VitalConnect's direct competitors, Wearlinq, Inc. ("Wearlinq"), and soliciting one of VitalConnect's clients, Novant Health, Inc. ("Novant").

At this stage, the Court's analysis begins and ends with the text of the Agreement. VitalConnect must "defend the text of the covenant[s] it imposed." *See HKA Glob., LLC v. Beirise*, No. 2024-0910, 2025 WL 3639811, at *5 (Del. Ch. Dec. 16, 2025). As written, the

covenants are unenforceable under Delaware law, so, for the reasons outlined below, the Court will **DENY** VitalConnect's motion for a preliminary injunction.

## FINDINGS OF FACT

The Court's analysis of VitalConnect's motion for a preliminary injunction is largely limited to the text of the Agreement, so its findings of fact are accordingly circumscribed to background information. The Court finds the following facts:

VitalConnect is a medical device company headquartered in San Jose, California and incorporated in Delaware that develops and sells the VitalPatch, a wearable cardiac monitoring device. Dkt. 62 ¶¶ 4, 12. Although its precise geographic scope is not clear from the record, VitalConnect's business is generally limited to the United States. *See* Dkt. 77 at 50:7-15 ("Hr'g Tr."). The VitalPatch runs on a specialized platform powered by VitalConnect's proprietary VitalRhythm1 algorithm. *See* Dkt. 5-2 ¶¶ 8-9, 11. The VitalPatch collects real-time cardiac information about the patient, which it contemporaneously transmits to clinicians, permitting them to monitor clinically significant events and intervene quicker in the event of a heart attack or atrial fibrillation, for instance. *See id.* ¶¶ 8-9.

Brett Matrazzo joined VitalConnect in 2022 as a "Key Accounts Manager," and he was primarily tasked with managing VitalConnect's relationship with Novant, a hospital system in North Carolina. *See* Dkt. 36-2 at 21:7-12, 30:17-31:7. Matrazzo was a strategic point-of-contact with Novant because he previously worked as a physician's assistant for

a cardiology practice in Winston-Salem, North Carolina and spent nearly twenty years selling cardiac devices to doctors in North Carolina. *See* Dkt. 58-5 ¶¶ 12, 14-15. Indeed, according to VitalConnect, its business relies on customer relationships cultivated by account managers like Matrazzo, *see* Dkt. 5-2 ¶ 24, and Matrazzo testified he spent most of his time at Novant facilities communicating with its personnel about VitalConnect's products, *see* Dkt. 36-2 at 33:11-18.

In September 2022, Matrazzo signed the Agreement at issue in this dispute. *See generally* Dkt. 1-1 ("Agreement"). The Agreement states that it is governed by Delaware law. *Id.* § 11(a). And it contains three relevant restrictive covenants: a non-compete covenant, Section 8(c); a customer non-solicitation covenant, Section 8(b); and a confidentiality covenant, Section 3(a). *See* Agreement §§ 3(a)-(b), 8(b)-(c). All three covenants imposed obligations on Matrazzo during the term of his employment with VitalConnect and some length of time thereafter. *See id.* Section 8(c) further stipulates to the reasonableness of all the Agreement's covenants and the irreparable harm VitalConnect will face if any are breached, and it purports to encourage the reformation of any covenants a court may determine are unenforceable. *See id.* § 8(c).

Beginning in 2025, Matrazzo claims he began to lose faith in the product he sold. *See* Dkt. 58-5 ¶ 28. As part of his responsibilities for VitalConnect, Matrazzo would solicit and collect feedback on the VitalPatch from Novant physicians. *See* Dkt. 5-2 ¶¶ 32-33; *see also* Dkt. 36-2 at 125:9-126:8. Beginning in mid-2025, Novant's physicians began to raise

a growing list of concerns with the VitalPatch to Matrazzo, which he raised to his then-supervisor, Alicia McDowell Knaub. *See, e.g.*, Dkts. 59-28, 59-29, 59-30, 59-40. Matrazzo did not believe VitalConnect adequately addressed the complaints, so he began to look for employment elsewhere, *see* Dkt. 58-5 ¶ 28, contacting Konrad Morzowksi, the CEO of one of VitalConnect's direct competitors, Wearlinq, in August 2025, *see* Dkt. 36-2 at 63:4-64:17. A month later, he emailed the Agreement to Morzowksi for Wearlinq's lawyers to review, adding that he "look[ed] forward to speaking again . . . soon." Dkt. 28-3 at BRETT_00000131; *see also* Dkt. 36-2 at 72:17-76:19. Matrazzo spoke with Morzowksi again in September 2025, intimating that he would be interested in moving from a sales role to something on "the research/education side of the industry." Dkt. 59-21 at 65:22-66:8. Matrazzo then reported to Knaub that Michael Underwood, a former employee of VitalConnect that left to join Wearlinq, had approached him to join Wearlinq and solicit Novant on its behalf. *See* Dkt. 36-3 at 58:10-59:25.

In December 2025, Matrazzo forwarded from his VitalConnect email to his personal email a draft correspondence to Morzkowski. The draft email references Matrazzo's prior discussions with Underwood and discloses allegedly non-public confidential information about VitalConnect and its customers, including Novant. *See* Dkt. 28-4. Matrazzo wrote, "As you are aware, I have deep relationships [at Novant] and have been speaking, in the shadows, with several of the key decision makers. All have expressed interest in looking more closely at WearLinq . . . ." *Id.* He further intimated

that he had discussed with two other VitalConnect employees (both of whom now work for Wearlinq) about the possibility of joining Wearlinq. *Id.*; *see also* Dkt. 36-2 at 121:23-125:8.

The record reveals that on January 16, 2026, Matrazzo was invited to a meeting with around ten Novant physicians in an email with the subject line "Wearlinq Monitor." *See* Dkt. 36-8 at VITALCONNECT_00002222. When asked about the meeting at his deposition, Matrazzo denied attending the meeting, but he admitted that he met several Wearlinq employees "at the hospital and got them to the proper location for the meeting" and then introduced the individuals from Wearlinq to Novant "while people were milling about" before the meeting began. *See* Dkt. 36-2 at 129:2-130:24. Not long after the meeting, Novant began trialing Wearlinq's competing cardiac monitoring device. *See* Dkt. 22-3 ¶¶ 9-10.

Matrazzo ultimately resigned from VitalConnect to join Wearlinq in April 2026. According to Matrazzo, he reached out to Wearlinq to formally inquire about a job sometime in March 2026 after he determined that VitalConnect was unwilling to address persisting issues related to the problems raised by Novant's physicians, *see* Dkt. 58-5 ¶ 31; Dkt. 59-21 at 59:2-6, 61:19-62:6, 71:6-18, although VitalConnect contends that Matrazzo instead concealed Novant's trial with Wearlinq from VitalConnect, *see* Dkt. 36-3 at 145:17-149-12, 151:21-152:2. Six days before he resigned, Matrazzo emailed himself various documents allegedly containing confidential information about VitalConnect, its

products, and customers. *See* Dkt. 5-2 ¶¶ 49-51; Dkt. 5-4 ¶ 21. Matrazzo then joined Wearlinq as its Director of Clinical Product Operations, Dkt. 36-2 at 87:6-12, and again forwarded himself documents and data sets from his time at VitalConnect, *see* Dkt. 5-4 ¶ 24. Matrazzo admitted that he continues to speak with Wearlinq personnel regarding Novant, *see* Dkt. 36-2 at 45:24-46:25, although he no longer works in a client-facing role and, according to him, does not share any relevant job duties with his position at VitalConnect, *see* Dkt. 59-21 at 86:5-88:4; *see also* Dkts. 59-15, 59-73.

On August 6, 2026, VitalConnect announced an agreement in principle to be acquired by another competitor, iRhythm Technologies, Inc. ("iRhythm"). *See* Dkt. 59-87.

## PROCEDURAL HISTORY

VitalConnect initiated this action on May 7, 2026. *See generally* Dkt. 1. The same day, it filed the present motion for a preliminary injunction and a supporting brief. *See generally* Dkts. 4-5. On May 26, 2026, the parties filed a joint motion for expedited discovery ahead of a hearing on plaintiff's motion for a preliminary injunction, *see* Dkt. 11, which the Court granted, *see* Dkt. 16. After conducting some discovery, VitalConnect filed a supplemental brief in support of its preliminary injunction on July 3, 2026. *See* Dkt. 36. Matrazzo responded in opposition on August 6, 2026, *see* Dkt. 58, and VitalConnect filed its reply in further support of its motion on August 20, 2026, *see* Dkt. 64. Concurrently, VitalConnect filed an amended complaint, *see* Dkt. 62, to which

Matrazzo filed an answer, *see* Dkt. 63. After concluding that VitalConnect raised new, previously undisclosed evidence in connection with its reply brief, this Court granted Matrazzo's motion for leave to file a sur-reply. *See* 08/28/2026 Text Order; *see also* Dkt. 76 (Matrazzo's sur-reply). Thereafter, the Court held a hearing on VitalConnect's motion for a preliminary injunction on August 31, 2026. *See* 08/31/2026 Minute Entry. The motion is now ripe for this Court's consideration.

## STANDARDS OF REVIEW

VitalConnect has not demonstrated it is entitled to the exceptional relief of a preliminary injunction. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement to preliminary injunctive relief under *Winter*, the plaintiff must show "(1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) equity favors granting preliminary relief; and (4) preliminary relief is in the public interest." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 (4th Cir. 2025). Failure to establish any of the four *Winter* factors will preclude the award of a preliminary injunction. *Frazier v. Prince George's County*, 86 F.4th 537, 544 (4th Cir. 2023).

## CONCLUSIONS OF LAW

VitalConnect does not meet its burden to demonstrate that any of the covenants are likely enforceable under Delaware law, so the Court will deny its request for a

preliminary injunction. While a likelihood of success on the merits does not require "certainty of success," the plaintiff must meet its burden to demonstrate that it is "likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Here, VitalConnect cannot demonstrate likely success at trial because the Agreement's covenants are overbroad under Delaware law, and the Court declines to reform the covenants at this preliminary stage, consistent with recent authority from the Delaware courts.

The Court begins by addressing the substantive law applicable to the parties' dispute, concluding that Delaware law applies. It next assesses the enforceability of the three restrictive covenants that VitalConnect seeks to enforce against Matrazzo, determining that all are overbroad. The Court then explains why it declines VitalConnect's invitation to reform, or "blue pencil," the Agreement's overbroad covenants. Finding VitalConnect has failed to establish a likelihood of success on the merits, one of the four *Winter* factors, *Frazier*, 86 F.4th at 544, the Court ultimately denies VitalConnect's request for a preliminary injunction.

## I. The Court Will Apply Delaware Law to Determine the Enforceability of the Agreement's Covenants.

The parties' express Delaware choice-of-law clause controls. In diversity cases such as this one, the Court must determine the applicable law to the parties' dispute, which in this case centers around an alleged breach of a contract. To determine the applicable law, the Court looks at the choice-of-law rules of the forum state—here, North

Carolina. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941). In North Carolina, a contract is governed by North Carolina law if the contract bears an "appropriate relation" to the state. N.C. Gen. Stat. § 25-1-301(b). North Carolina courts interpret the phrase "appropriate relation" to impose the law of the state with the most significant relationship to the contract, usually the "state where the Agreement was made or, in certain instances, by the law of the state of performance." *Boudreau v. Baughman*, 322 N.C. 331, 368 S.E.2d 849, 854 (1988). However, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 518 S.E.2d 205, 209 (1999) (quoting *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655, 656 (1980)). North Carolina courts thus will enforce an express choice-of-law provision in a contract "as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of [North Carolina] or otherwise applicable law." *Torres v. McClain*, 140 N.C. App. 238, 535 S.E.2d 623, 625 (2000) (quoting *Behr v. Behr*, 46 N.C. App. 694, 266 S.E.2d 393, 395 (1980)).

The parties expressly agreed that Delaware law would govern the Agreement. Section 11(a) of the Agreement provides, "[t]he validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware, without giving effect to the principles of conflict of laws." Agreement § 11(a). Because the parties consented to Delaware law in the Agreement, Delaware's law presumptively

controls unless the parties "had [no] reasonable basis for their choice of law" or the choice-of-law provision violates a fundamental North Carolina public policy. *See Torres*, 538 S.E.2d at 625.

The parties had a reasonable basis for their Delaware choice-of-law clause. Though it is true that the Agreement was signed in North Carolina, *see* Dkt. 58-5 ¶ 17, VitalConnect is incorporated in Delaware and conducts business in various states, *see* Dkt. 1 ¶ 4; *see also* Hr'g Tr. at 50:2-15. Given the scope of VitalConnect's business, "it is reasonable for [it] to choose a single state's law (Delaware, the state of its incorporation which has well-established and robust corporate law precedents) to govern its agreements with all [its] employees rather than research and revise the agreements to comply with each employee's state's law on restrictive covenants (and other provisions)." *Worley Claims Servs., LLC v. Jefferies*, 429 F. Supp. 3d 146, 156 (W.D.N.C. 2019). Matrazzo only argues that North Carolina would apply in the absence of the parties' choice-of-law clause because the Agreement was formed in North Carolina. *See* Dkt. 58 at 17-18. That is not a sufficient reason to disregard the parties' express contractual choice because North Carolina will generally enforce choice-of-law provisions, regardless of where the contract was formed. *See Tanglewood*, 261 S.E.2d at 656; *see also Volvo Constr. Equip. N.A., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 601 (4th Cir. 2004) (North Carolina's default rule of *lex loci contractus* is overcome by an express choice-of-law provision).

Nor does the application of Delaware law violate fundamental North Carolina public policy. Matrazzo argues that application of Delaware law would permit VitalConnect to enforce restrictive covenants in North Carolina that may otherwise violate North Carolina law. Dkt. 58 at 18. But that fact alone "does not necessarily mean that the foreign law violates a fundamental public policy of North Carolina." *Worley*, 429 F. Supp. 3d at 157.[1] Matrazzo points the Court to no North Carolina court decision or statute barring enforcement of a choice-of-law provision in an employment contract merely because that choice-of-law provision could potentially enforce a restrictive covenant unlawful under North Carolina law.[2] The Court accordingly applies Delaware

---

[1] At the hearing, Matrazzo's counsel adopted a more nuanced choice-of-law argument, contending that the Contract's express Delaware choice of law provision would control *unless* the Court determined the covenants were enforceable under Delaware law. Hr'g Tr. at 46:17-47:15. According to Matrazzo's counsel, only then would North Carolina apply to shield against this Court enforcing a contract that would be unenforceable under North Carolina law. *See id.* at 47:11-15. Forgetting for the moment the novelty of that argument, the Western District of North Carolina already rejected the proposition that Delaware law would possibly enforce overbroad covenants is sufficient to disregard an express Delaware choice of law clause in favor of North Carolina law. *See Worley*, 429 F. Supp. 3d at 156-57.

[2] *Cf. Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 534 (5th Cir. 2020) (application of Delaware law to restrictive covenants contained in employment contract formed in Texas would violate Texas public policy under Texas Supreme Court precedent); *RMSM Ltd. v. Indus. Serv. Sols., LLC*, No. 1:25-cv-1037, 2026 WL 878880, at *4-5 (D. Colo. Mar. 31, 2026) (Colorado Wage Claims Act prohibited application of Delaware law to restrictive covenants contained in contracts for employment formed in Colorado); *Boone v. Corestaff Support Servs., Inc.*, 805 F. Supp. 2d 1362, 1369-70 (N.D. Ga. 2011) (under Georgia Supreme Court precedent, it would violate fundamental Georgia public policy to apply foreign law to a non-compete that would be unenforceable under Georgia law); *see also Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 957-61 (Del. Ch. 2020) (relying on Cal. Bus. &

law to the parties' Agreement. *See Worley*, 429 F. Supp. 3d at 156-57 (also concluding that express Delaware choice-of-law provision in employment contracts containing restrictive covenants did not violate fundamental North Carolina public policy even if Delaware law would reform a covenant otherwise unenforceable under North Carolina law).

## II. The Agreement's Restrictive Covenants are Unenforceable as Written.

Restrictive covenants, like all other contractual obligations, must "meet general contract law requirements." *Tristate Courier & Carriage, Inc. v. Berryman*, No. 20574, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004). Thus, VitalConnect must demonstrate all the following elements: (1) a valid contractual obligation, (2) a breach of that obligation, and (3) a causally related injury to that breach entitling it to a remedy. *Hub Grp. v. Knoll*, No. 2024-0471, 2024 WL 3453863, at *7 (Del. Ch. July 18, 2024).

VitalConnect's motion for a preliminary injunction fails because it cannot prove the covenants at issue in this case are valid contractual obligations. VitalConnect seeks enforcement of three restrictive covenants in the Agreement: (1) a non-compete covenant, (2) a customer non-solicitation covenant; and (3) a confidentiality covenant. *See* Dkt. 36 at 1; *see also* Agreement §§ 3(a)-(b), 8(b)-(c). The Court concludes that VitalConnect is unlikely to succeed on the merits of its claims for specific performance of any of the three covenants because they are unreasonably overbroad and therefore unenforceable under

---

Prof. C. § 16600, which generally bans all restrictive covenants in California employment contracts, to conclude that California law, not Delaware law, applied to non-compete dispute concerning employment in California).

Delaware law. Though Matrazzo is alleged to have engaged in misappropriation of one of VitalConnect's clients and its confidential information, the covenants are far more restrictive than VitalConnect's legitimate economic interests in goodwill and confidentiality justify, so the Court will not enforce them.

Delaware courts do not "mechanically or automatically" enforce restrictive covenants. *Rsrch. & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at *6 (Del. Ch. Nov. 18, 1992) (internal quotations omitted). Instead, because they are restraints on trade, restrictive covenants "must be closely scrutinized." *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) (quoting *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. 1977)); *see also Hub Grp.*, 2024 WL 3453863, at *7 ("Delaware courts favor the public interest of competition." (quotation modified and internal quotations omitted)). Restrictive covenants contained in employment contracts require an even more searching inquiry. *See Daxco, LLC v. Timm*, No. 2025-0942, 2026 WL 172862, at *7 (Del. Ch. Jan. 22, 2026); *see also Faw, Casson & Co.*, 375 A.2d at 465 ("[C]ovenants are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts to the sale of a business.").

Accordingly, Delaware courts "carefully review" restrictive covenants to ensure that they meet all the following requirements: (1) they are reasonable in geographic and temporal scope; (2) they "advance a legitimate economic interest" of the party seeking enforcement; and (3) they "survive a balancing of the equities." *FP UC Holdings, LLC v.*

*Hamilton*, No. 2019-1029, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020). Courts also assess each restrictive covenant's reasonableness holistically, in conjunction with an agreement's other covenants. *See Cleveland Integrity Servs., LLC v. Byers*, No. 2024-0371, 2025 WL 658369, at *8 (Del. Ch. Feb. 28, 2025) (Delaware courts assess restrictive covenants "holistically and in context" (internal quotations omitted)). "That means evaluating all of the dimensions of the restrictive covenant and considering how it operates with other restrictions in the contract." *Sunder Energy LLC v. Jackson*, 305 A.3d 723, 753 (Del. Ch. 2023) ("*Sunder I*"), *aff'd in part, rev'd in part on other grounds by* 332 A.3d 472 (Del. 2024).[3] It may be the case that a covenant is reasonable in isolation, but unreasonable when read within a contract's context. *See id*. The opposite may also be true. *Cf. Hub Grp.*, 2024 WL 3453863, at *10 (unlimited geographic scope of non-compete covenant may have been reasonable if meaningfully constrained by limiting language in contract).

The Court addresses the Agreement's non-compete provision before turning to the customer non-solicitation and confidentiality covenants. It concludes that none are

[3] *Sunder I*'s holdings regarding the restrictive covenants at-issue in that case were either unchallenged on appeal or affirmed by the Delaware Supreme Court. *See Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 486-90 (Del. 2024) (observing that the appellant did not challenge the Chancery Court's findings of fact or conclusions of law regarding the covenants' overbreadth and affirming its decision to decline to reform the overbroad covenants). *Sunder I* is still cited by the Delaware courts, including the Delaware Supreme Court, for its analysis of restrictive covenants. *See, e.g.*, *Payscale, Inc. v. Norman*, __ A.3d __ , 2026 WL 774876, at *3 & n.12 (Del. Mar. 19, 2026).

enforceable under Delaware law. And though VitalConnect rightly suggests that this Court may reform the covenants' overbreadth, the Court declines to exercise that discretionary authority at the preliminary injunction stage. VitalConnect thus does not demonstrate it is likely to succeed on the merits of its breach of contract claims premised on breach of the Agreement's (as written, overbroad) covenants.

### A. The Agreement's non-compete provision is geographically unlimited and untethered from VitalConnect's legitimate business interests.

The Agreement's non-compete provision is overbroad and unenforceable because it expressly applies globally to businesses that do not directly compete with VitalConnect. *See* Agreement § 11(c).

The "Non-Competition" clause states, in relevant part:

> I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, without the prior written consent of the Company's Chief Executive Officer, either directly or indirectly, whether alone or in conjunction with others, as an employee, employer, consultant, agent, principal, partner, shareholder, corporate officer, director, or through any other kind of ownership or in any other representative or individual capacity: (i) engage or participate in, manage, operate, join, render any services to, or acquire any financial or beneficial interest in, any Business (as defined below); (ii) permit my name directly or indirectly to be used by or to become associated with any other person in connection with any Business; or (iii) induce or assist any other person to engage in any of the activities described in clauses (i) or (ii) above. For purposes of this Agreement, "Business" means any business or activity anywhere in the world that relates to vital sign monitoring or any other business or activity

> anywhere in the world that is otherwise carried on or intended to be pursued by the Company at the time of termination of the Relationship.

*Id.*, § 8(c).

Understanding this covenant requires breaking down each part to appreciate the full scope of the intended restraint on Matrazzo's future employment opportunities. The clause essentially prohibits Matrazzo from "either directly or indirectly" engaging or participating in, managing, operating, joining, rendering services to, or acquiring any financial or beneficial interest in any "Business" or "directly or indirectly" using or permitting the use of his name in conjunction with any "Business." *Id.* Critically, the Agreement defines the term "Business" as "any business or activity *anywhere in the world* that *relates* to vital sign monitoring or any other business or activity *anywhere in the world* that is otherwise *carried on or intended to be pursued by the Company* at the time of the termination" of the parties' employment relationship. *Id.* (emphasis added). The term "Company" includes VitalConnect "or any of its current or future subsidiaries, affiliates, successors or assigns." *Id.* at 4. VitalConnect even concedes that Section 8(c), fairly understood, extends worldwide. *See* Dkt. 36 at 20. On its face, VitalConnect cannot demonstrate that Section 8(c)'s unconstrained geographic scope is tailored to its business interests or tempered by meaningful language in the Agreement. *See Payscale, Inc. v. Norman*, __ A.3d __ , 2026 WL 774876, at *5 (Del. Mar. 19, 2026) (party seeking enforcement of geographically unlimited non-compete covenant must demonstrate

"particularly strong" interest in enforcement to justify the limitation); *Hub Grp.*, 2024 WL 3453863, at *10 (limiting language in a covenant may constrain overbroad geographic reach).

Notably, Section 8(c)'s one-year temporal scope is insufficient to save it. In assessing geographic and temporal reasonableness, courts must "consider how the temporal and geographic restrictions operate together" because the "two dimensions necessarily interact." *Sunder I*, 305 A.3d at 753 (quoting *Del. Elevator, Inc. v. Williams*, No. 5596, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011)). Generally speaking, "a longer restrictive covenant will be more reasonable if geographically tempered, and a broader restrictive covenant will be more reasonable if temporally tailored." *Id.*; *see also BluSky Restoration Contractors, LLC v. Robbins*, No. 2025-0726, 2026 WL 599148, at *5 (Del. Ch. Mar. 4, 2026) (same). However, "[a] court must not tick through individual features of a restriction in isolation, because features work together synergistically." *Sunder I*, 305 A.3d at 753.

While Section 8(c)'s one-year limitation makes it "more reasonable," *see Sunder I*, 305 A.3d 753, it does not make the non-compete covenant *de facto* enforceable, *see All Pro Maids, Inc. v. Layton*, No. 053, 2004 WL 1878784, at *5 n.23 (Del. Ch. Aug. 9, 2004) ("Noncompete agreements covering *limited areas* for two years or less have been held to be reasonable." (emphasis added)); *WCG Clinical, Inc. v. Sitero, LLC*, No. 1:24-cv-1080, 2025 WL 107662, at *4 (S.D. Ind. Jan. 15, 2025) (Under Delaware law, "[a] twelve-month

noncompete is not necessarily too long *if the geographic scope is limited*" (emphasis added)).[4] The Delaware Court of Chancery has repeatedly declined to enforce one- or two-year non-compete covenants with international reach when they operated to prohibit the former employee from working in any capacity for any company engaging in a business similar to his former employer or its affiliates. *See, e.g.*, *Hub Grp.*, 2024 WL 3453863, at *8-9 (one-year non-compete covering any business operating in the United States, Canada, Mexico, or India that actually or potentially competed with former employer or its affiliates was overbroad); *Daxco*, 2026 WL 172862, at *8 (two-year non-compete with global scope that extended to employer's affiliates and did not limit itself to employee's prior scope of work was overbroad); *Cleveland Integrity*, 2025 WL 658369, at *10 (two-year non-compete provision with geographic scope reaching all of North America was facially broader than necessary to protect company's U.S.-based business interests). What the non-compete covenants in *Hub Group*, *Daxco*, and *Cleveland Integrity*

[4] VitalConnect asserts that one-year non-competes are *per se* reasonable regardless of geographic scope, relying on precedent from the Delaware Court of Chancery dating back to 2007 and earlier, when that court generally held two-year-or-less non-compete covenants enforceable under an analysis that considered temporal and geographic scope separately. *See* Dkt. 36 at 20-21; *see also, e.g.*, *Weichert Co. of Pa. v. Young*, No. 2223, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007); *Tristate Courier & Carriage*, 2004 WL 835886, at *11. As the Court of Chancery has more recently observed, however, "[t]hese cases predate" that court's "prescription to consider the period and geography together," rendering VitalConnect's authority largely unhelpful to this Court's analysis. *See* *Centurion Serv. Grp., LLC v. Wilensky*, No. 2023-0422, 2023 WL 5624156, at *4 n.25 (Del. Ch. Aug. 21, 2023).

did implicitly, Section 8(c) does explicitly. Section 8(c) expressly applies internationally to a broad swath of employers and reaches VitalConnect's current and future subsidiaries. When, as here, "an employer overreaches by imposing an obviously overbroad geographic restriction on the employee's ability to seek employment after separation," Delaware courts "will readily decline to enforce the restriction." *FP UC Holdings*, 2020 WL 1492783, at *6.

The non-compete covenant is especially overbroad because it is not restricted to protecting VitalConnect's business interests. A restrictive covenant will only be enforced to the extent that it is necessary to protect an employer's legitimate economic interests. *Cleveland Integrity*, 2024 WL 658369, at *8. Delaware courts have recognized that legitimate economic interests "include protection of employer goodwill and protection of employer confidential information from misuse." *Rsrch. & Trading Corp.*, 1992 WL 345465, at *12. But even if the employer seeks enforcement of a covenant to protect a legitimate economic interest, Delaware courts "will not enforce a covenant that is more restrictive than [the company's] legitimate interests justify or that is oppressive." *See Norton Petroleum Corp. v. Cameron*, No. 15212, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998). "When reviewing restrictive covenants, Delaware courts have taken into account the public interest in competition, the need for individuals to be able to earn a living, and the imbalances in bargaining power and repeat-player experience that exist between businesses and individuals." *Sunder I*, 305 A.3d at 753. If a restrictive covenant would,

on balance, impose an undue hardship on the former employee, it will not be enforced. *Kodiak*, 2022 WL 5240507, at *12.

Here, the non-compete does not protect VitalConnect's legitimate business interests because it is not tailored to Matrazzo's prior role at VitalConnect or his concededly circumscribed geographic focus. *See Daxco*, 2026 WL 172862, at *8 (non-compete covenant that prohibited defendant from "working at a company providing software to gym in at least sixty-eight countries" was unreasonable when it prohibited him from working in any role at those companies, even though is prior role was limited to SaaS sales); *Hub Grp.*, 2024 WL 3453863, at *10 (non-compete was overbroad where it was not limited to employee's prior role). It is unreasonable to prohibit Matrazzo from working for any company that engages in business that "relates" to "vital sign monitoring" anywhere in the world, *see* Agreement § 8(c), when his role at VitalConnect was purely limited to liaising with a single client (Novant) in one state (North Carolina). *See* Dkt. 79 ¶ 11 ("VitalConnect admits that Matrazzo worked exclusively in North Carolina and predominantly for the Novant Winston-Salem account."). Given Matrazzo's narrow geographic focus, it stretches reason to assert that VitalConnect has an interest in constraining his future employment worldwide, especially when he would be prohibited from working in any capacity for any company engaging in conduct that "relates" to vital sign monitoring. *See Weichert Co. of Pa. v. Young*, No. 2223, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) ("[T]he reasonableness of a covenant's scope is not

determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect.").

To save the non-compete provision, VitalConnect suggests that Section 8(c) is practically limited to the United States, where it competes with Matrazzo's new employer, Wearlinq. *See* Dkt. 36 at 20. Delaware courts construe contracts as they are written according to their plain language unless terms are specifically defined. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). The Agreement specifically defined the term "Business" to be any business anywhere in the world that engages in conduct: (1) "that relates to" VitalConnect's business or the business of its affiliates; or (2) that VitalConnect or its affiliates intended to engage in at the time Matrazzo resigned. Agreement § 8(c). VitalConnect may not redefine that term because its competitors, in fact, exist only in the United States. *See* Hr'g Tr. at 50:2-15 (conceding that VitalConnect only competes with Wearlinq in the United States); *see also HKA Glob.*, 2025 WL 3639811, at *5. VitalConnect does not even attempt to argue that it plans to expand internationally (or explain why Matrazzo would pose a threat to that expansion). *Cf. Rsrch. & Trading Corp.*, 1992 WL 345465, at *12 (if employer's customer base extends nationwide or internationally and former employee would gain a competitive advantage from employment in some part of that market, a broad geographic scope may be reasonable). And Section 8(c) reaches VitalConnect's affiliates, including any potential new parent company or its subsidiaries. *See* Hr'g Tr. 52:18-25 (VitalConnect admitting

that the Agreement would cover iRhythm, its affiliates, and its subsidiaries); *see also Daxco*, 2026 WL 172862, at *8 ("Where a non-compete protects both the employer and the employer's affiliates, the employer must justify the broader legitimate economic interest and demonstrate that the employee had actual knowledge of the other affiliates' scope of operations." (internal quotations omitted)).

VitalConnect also defends Section 8(c)'s global reach by claiming that it is limited by the language "relates to vital sign monitoring." *See* Dkt. 36 at 20; *see also* Dkt. 64 at 6 n.8 ("VitalConnect's Agreement is limited to its core cardiac monitoring business and is directed at Matrazzo's specific role."). The Court disagrees that Section 8(c)'s limitation to businesses "relating" to vital sign monitoring is sufficient because it expressly encompasses conduct *beyond* VitalConnect's cardiac monitoring business. Delaware courts recognize that geographically unlimited non-compete covenants may be reasonable if they prohibit a former employee from engaging in conduct "in competition with" the former employer's business, rather than broader conduct "similar to" that business. *See, e.g.*, *Lyons Ins. Agency, Inc. v. Wilson*, No. 2017-0092, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018). Such non-compete covenants may be reasonable because they "inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is

expressly set forth in the agreement." *Del. Express Shuttle, Inc. v. Older*, No. 19596, 2002 WL 31458243, at *13 (Del. Ch. Oct. 23, 2002).

Here, Section 8(c) does not contain such an implied geographic limitation. *See* Agreement § 8(c) ("Business" includes "any business or activity anywhere in the world that *relates* to vital sign monitoring" (emphasis added)). In the Agreement's context, the word "relate" means "to have relationship or connection." *Relate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/relate [https://perma.cc/R7KL-NR7U] (last visited Sept. 16, 2026). The plain meaning of the word encompasses companies that engage in conduct similar to—but not in direct competition with—VitalConnect. The term would cover, for instance, vital sign monitoring devices that do not monitor cardiac events (like the VitalPatch) and therefore do not compete with VitalConnect. *See Del. Express*, 2002 WL 31458243, at *13 (prohibiting a former employee from "engaging in business activities 'similar to' those of" the employer "exceeds any legitimate economic interests of" that employer). One of VitalConnect's own witnesses agreed. Knaub testified that she does not view Section 8(c) as reaching only direct competitors, conceding that it would prohibit Matrazzo from working at Apple Stores because they sell Apple Watches, which contain built-in vital sign monitors. *See* Dkt. 59-7 at 74:13-79:4. That Section 8(c) covers employers engaging in conduct merely similar to VitalConnect's business renders it overbroad because while "competitiveness may be a legitimate economic interest, that interest is not advanced by a non-competition covenant . . . that

generally bans working in a similar business[.]" *Gordian Med., Inc. v. Vaughn*, No. 22-319, 2024 WL 1344481, at *15 (D. Del. Mar. 30, 2024).[5]

Further, any limitation that the "relates to" language may impose on the scope of Section 11(b) is destroyed by the provision's secondary clause. "Business" also includes "any other business or activity anywhere in the world that is otherwise carried on or intended to be pursued by the Company at the time of termination of the" parties' business relationship. Agreement § 8(c). Such language is not meaningfully limited to VitalConnect's competitive marketplace (and, indeed, is designed to encompass *new* marketplaces VitalConnect intends to enter), "eviscerat[ing] any implied geographic limitation" that could be drawn from Agreement's language. *See FP UC Holdings*, 2020 WL 1492783, at *7; *see also Centurion*, 2023 WL 5624156, at *4-5 (two-year non-compete covenant was overbroad where its geographic scope included areas where employer

[5] For that reason, this case is distinguishable from a nationwide two-year non-compete covenant recently enforced by the Delaware Court of Chancery. *See BHP Partners, Co., LP v. Keel*, No. 2025-1289, 2026 WL 1732582, at *8 (Del. Ch. June 16, 2026). The non-compete covenant there was limited to direct competitors and tightly circumscribed to the specific states in which the plaintiff operated or intended to expand into within six months of the defendant leaving. *Id.* at *3-4, *10-11. Further, unlike Matrazzo, the defendant in *BHP* was an executive-level employee involved in company-wide initiatives that exposed him to confidential information about the business's nationwide operations, risking the chance that he could misuse the plaintiff's confidential information nationwide. *Id.* at *9-10. Although the parties dispute the extent of Matrazzo's company-wide knowledge based on his service on several company committees, *compare* Dkt. 36 at 5 *with* Dkt. 58 at 12-13; Hr'g Tr. at 120:11-121:11, the parties readily agree his business relationships were limited to Novant in North Carolina, particularly Novant Winston-Salem, *see* Dkt. 79 ¶ 11.

conducted business *and* areas where it "actively planned to solicit and engage in any business activities in which it was engaged or actively planning to engage at any time during" the employee's time at the company). Because the two definitions of "Business" purporting to limit Section 8(c)'s reach "are listed in the disjunctive," if either are overbroad, "the [geographical] restriction is overbroad." *See Hub Grp.*, 2024 WL 3453863, at *9. Here, neither clause of Section 8(c) places meaningful limits on its unlimited geographic scope, instead broadening the reach of the clause to companies that engage in conduct that is merely similar to VitalConnect or any of its current or future affiliates and subsidiaries.

Section 8(c) is accordingly overbroad and unenforceable.[6] It has an unlimited geographic scope untethered from any legitimate business interest that VitalConnect could possess. The non-compete is not limited to Matrazzo's prior scope of work, instead broadly prohibiting him from working in any capacity for any business that "relates to vital sign monitoring." Agreement § 8(c). And although it is limited to only one year, that shorter temporal scope cannot proscribe the covenant's unimaginably broad geographic reach, especially when Section 8(c) purports to reach geographic territory and competitive marketplaces "much larger than that where [VitalConnect's] economic

---

[6] Although Section 8(c) contains a stipulation as to the reasonableness of the various covenants' scope, such a stipulation does not impact the Court's enforceability analysis because it is bound to independently assess the enforceability of the restrictive covenants. *See Adams*, 2022 WL 5240507, at *5-7.

interests lie." *See Intertek Testing Servs. NA, Inc. v. Eastman*, No. 2022-0853, 2023 WL 2544236, at *5 (Del. Ch. Mar. 16, 2023). Because Section 8(c) is broader that VitalConnect's legitimate business interests justify, "[i]t would be inequitable to enforce such [an] unreasonable covenant[] against" Matrazzo. *See Kodiak*, 2022 WL 5240507, at *13. The Court declines to enforce Section 8(c) of the Agreement.

**B. The Agreement's customer non-solicitation provision prevents Matrazzo from soliciting anyone to purchase any product offered by any competitor to VitalConnect or related entities, forever.**

Section 8(b) of the Agreement—its customer non-solicitation provision—is fatally overbroad for four reasons that collectively render the provision unenforceable. *First*, it covers expressly noncompetitive conduct, attempted solicitation. *Second*, it exceeds VitalConnect's legitimate business interests because it prohibits Matrazzo from soliciting "any client, customer or *other person*" to purchase products from competitors to VitalConnect or its related entities, Agreement § 8(b) (emphasis added), thereby prohibiting Matrazzo from employing Confidential Information to solicit *anyone* on behalf of a competitor. *Third*, it contains no geographic or temporal scope whatsoever, purporting to extend worldwide and last *ad infinitum*. *Fourth*, the Agreement's definition of "Confidential Information" is vague and overbroad, failing to place any limits on Section 8(b)'s overbreadth. These facets of Section 8(b) collectively operate to prohibit Matrazzo from soliciting or attempting to solicit anyone, anywhere in the world, to

purchase any product of any of VitalConnect's competitors, forever. That is not an enforceable covenant.

The parties agree that Section 8(b) states in relevant respects:

> I further agree that during the term of the Relationship, and following the termination of the Relationship for any reason, whether with or without cause, I shall not use any Confidential Information of the Company to influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

Agreement § 8(b).

To start, Section 8(b) is unenforceable because Delaware law does not permit employers to use restrictive covenants to prohibit the act of attempted solicitation. Section 8(b) prohibits Matrazzo from using any of VitalConnect's "Confidential Information" to "*attempt* to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company." Agreement § 8(b). The Delaware Court of Chancery has recently concluded that non-solicitation provisions in employment contracts that bar former employees from attempting to solicit their former employers' clients are overbroad. *See BankUnited, N.A. v. Shulick*, No. 2025-0956, 2026 WL 21637, at *9 (Del. Ch. Jan. 2, 2026); *BluSky*, 2026 WL

599148, at *10. These restrictions render non-solicitation covenants unenforceably overbroad because they capture non-competitive conduct. *See HKA Glob.*, 2025 WL 3639811, at *6. Section 8(b) is not sufficiently tailored to VitalConnect's business interests because it prohibits, for instance, Matrazzo from attempting—but failing—to solicit one of VitalConnect's clients. *See BankUnited*, 2026 WL 21637, at *9.

Section 8(b) also operates as a quasi-non-compete covenant because the inclusion of the phrases "other person" within its scope prohibits Matrazzo from engaging anyone on behalf of any competitor to VitalConnect for the purpose of promoting a competitor's product. Section 8(b) thus "suffers from . . . problems as to whom it covers and when it applies." *Sunder I*, 305 A.3d at 757. The phrase "other person" modifies the covenant to prohibit Matrazzo from soliciting *anyone* to purchase a competitor's products (regardless of whether VitalConnect has previously developed goodwill with that person). *See* Agreement § 8(b). Undoubtedly, Delaware law recognizes that an employer "has an interest in the goodwill created by its sales representatives and other employees" because that goodwill is "vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *Rsrch. & Trading Corp.*, 1992 WL 345465, at *12. But that interest does not justify a non-solicitation provision that covers unspecified "other persons" with whom VitalConnect *has not* developed *any* goodwill. *See, e.g.*, *BankUnited*, 2026 WL 21637, at *9 (non-solicitation covenant that prohibited solicitation of "unidentified" prospective clients was overbroad); *WCG*

*Clinical*, 2025 WL 107662, at *6 (observing that non-solicitation that covered unspecified prospective clients of former employer was "arguably" overbroad). And, again, the term "Company" includes VitalConnect's current and future subsidiaries and affiliates, heightening its suspect reach. *See Adams*, 2022 WL 5240507, at *12 (non-solicitation covenant that prohibited defendant from soliciting customers from plaintiff or its affiliates was "overbroad to the extent it covers customers, clients, or prospective customers and clients of subsidiaries" other than the entity purchased from the defendant).

Section 8(b)'s overbreadth is compounded by the complete absence of any temporal or geographic limitation. Section 8(b) is entirely silent on its geographic reach. And unlike the express one-year limitation contained in Sections 8(a) (prohibiting solicitation of VitalConnect employees) and 8(c) (the non-compete provision), Section 8(b) contains no temporal limitation whatsoever. *Compare* Agreement § 8(b) *with id.* §§ 8(a), (c). It is "untenable" for "a court to add a limitation that is not found within the express language of the contract," *see Alpine Inv. Partners v. LJM2 Cap. Mgmt., L.P.*, 794 A.2d 1276, 1286 (Del. Ch. 2002), especially when the parties explicitly imposed one-year covenants elsewhere in Section 8, *see Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999) (in a contract, "the expression of one thing is the exclusion of another"). A plain reading of the clause thus imposes non-solicitation obligations on Matrazzo for the remainder of his life that prohibits him from soliciting anyone,

anywhere in the world, to purchase any product offered by any of VitalConnect's competitors (or even competitors of its future affiliates).

VitalConnect does not even attempt to argue that Section 8(b) is limited temporally or geographically, instead taking the position that Delaware courts uphold "customer non-solicitation agreements protecting legitimate interests . . . regardless of temporal or geographic limitations." Dkt. 64 at 6. That is an overstatement of Delaware law. To the contrary, Delaware courts do not enforce restrictive covenants with such an awesome scope. *See, e.g.*, *Sunder I*, 305 A.3d at 756-58 ("potentially indefinite" non-solicitation provision that barred the former employee "from participating in any business that sells to any homeowner in the states where [his former employer] did business" before his departure was overbroad and unenforceable); *Weil Holdings II, LLC v. Alexander*, No. 2024-0388, 2025 WL 689191, at *5 (Del. Ch. Mar. 4, 2025) (similar). Section 8(b)'s indefinite temporal scope alone would render it suspect. *Cf. Labyrinth, Inc. v. Urich*, No. 2023-0327, 2024 WL 295996, at *23 & n.271 (Del Ch. Jan. 26, 2024) ("Only one Delaware case has found a ten-year [or longer] restrictive covenant reasonable, but it [was] coupled with a tightly circumscribed geographic scope." (citing *Tull v. Turek*, 147 A.2d 658 (Del. 1958)).[7]

---

[7] VitalConnect's reliance on *Research & Trading Corp.* is misplaced. *See* Dkt. 64 at 6. While *Research & Trading Corp.* sanctioned a global non-solicitation covenant "[g]iven the broad distribution of [the plaintiff's] customers geographically . . . and the limited nature of the relief" it sought, that non-solicitation covenant lasted only *one year*. *See* 1992 WL 345465, at *11-12. As the Court has already explained, unlike the other covenants in Section 8, which are expressly limited to one year, Section 8(b) contains no temporal limitation, purporting to last forever. The Court must assess the Agreement's covenants holistically.

Nor does Section 8(b)'s prohibition against solicitation by misusing "Confidential Information of the Company" alter the equation. *See* Agreement § 8(b); *see also* Dkt. 64 at 6. "Confidential Information" is so broadly defined that it is effectively no definition at all. The term is defined as follows:

> "Confidential Information" means information and physical material not generally known or available outside the Company [defined as "VitalConnect, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns"] and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined [as "any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship," except "any invention which qualifies fully for exclusion under the provisions of applicable state law, if any"]); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical

---

*See Cleveland Integrity*, 2025 WL 658369, at *8. It is irrelevant whether Section 8(b)'s global scope may have been reasonable in isolation because that global scope, coupled with its infinite length and other overbreadth problems render it unreasonable.

> financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

Agreement §§ 3(b), 4(b), 4(g). Later, the Agreement further stipulates that "the Company's Confidential Information includes information relating to the Company's employees, consultants, customers and others . . . ." *Id.* § 8.

The definition of Confidential Information is nothing more than "a pile of words." *See Sunder I*, 305 A.3d at 757; *Hub Grp.*, 2024 WL 3453863, at *7. The definition is so far-reaching that it can only be plausibly read to include all non-public information that Matrazzo acquired during his employment concerning VitalConnect or its customers, consultants, or employees that could conceivably be construed as falling within the scope of VitalConnect's business interests. *Hub Group* found a nearly indistinguishable definition of "Confidential Information" in another restrictive covenant unreasonably vague, concluding that it effectively "include[d] all nonpublic information related to [the plaintiff]." *See* 2024 WL 3453863, at *7, *11. Given the breadth of the term's definition in that covenant, which, as here, was "not limited to information that [the employee] had access to or utilized in his position," *Hub Group* held that the definition failed to meaningfully constrain the overbroad non-compete covenant at-issue in that case, which extended across four different countries to any business "substantially the same as" the former employer or its affiliated entities. *See id.* at *11-12. The provision in *Hub Group* is like Section 8(b) of the Agreement, which extends internationally to any business that

competes against VitalConnect. *See* Agreement §§ 3(b), 4(b), 4(g). As in *Hub Group*, Section 8(b)'s "limitation" to solicitation involving "Confidential Information" does nothing actually to limit it.

When Section 8(b)'s various terms are read collectively, the provision's full scope is revealed. All its overbroad terms collectively operate to prohibit Matrazzo from employing "Confidential Information"—such as it is—to solicit or even attempt to solicit any person, anywhere in the world on behalf of any competitor to VitalConnect, its affiliates, or its subsidiaries (present or future) at any time, forever. The Delaware courts would not enforce such a covenant. This Court declines to do so, as well.

### C. The Agreement's confidentiality provision is vague and overbroad, risking unknowing breach.

The Agreement's confidentiality covenant, Section 3(a), is vague and overbroad.[8] As explained above, the term "Confidential Information" as it is defined in Section 3(b) includes all nonpublic information Matrazzo learned while at VitalConnect of any competitive interest to VitalConnect. And Section 3(a) states that Matrazzo agrees "at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use … any Confidential Information that [he] obtain[s], access[es] or create[s] during the term of [his employment] … until such Confidential Information becomes

[8] Lest there be any doubt as to whether Section 3(a) is a covenant or standard contractual obligation, the Delaware Court of Chancery "has repeatedly analyzed confidentiality provisions under the restrictive covenant framework." *BluSky*, 2026 WL 599148, at *11 (collecting cases).

publicly and widely known and made generally available …." *Id.* The wording of Section 3(a) presents two problems: (1) it could be temporally unlimited in reach, and (2) the vague definition of Confidential Information covers a wide swath of information of indeterminate scope, risking unknowing breach. These overbreadth issues render it unenforceable.

Section 3(a)'s confidentiality obligations extend until "Confidential Information becomes publicly and widely known and made generally available," *see* Agreement § 3(a), which "could be endless" in temporal scope, *BluSky*, 2026 WL 599148, at *14 (holding a similar confidentiality provision overbroad and unenforceable). While that indefinite temporal length is "not determinative," it renders Section 3(a) unreasonable because "the definition" of Confidential Information is "not appropriately tailored." *Id.* at *12. Although Section 3(b) provides an impressive list of the "types of information and physical material" to which it applies, it expressly notes that the list is non-exhaustive. *See* Agreement § 3(b) (Confidential Information "includes" listed examples "*without limitation*" (emphasis added)); *see also BluSky*, 2026 WL 599148, at *12 (definition of "proprietary information" was vague and overbroad where clause instructed court to construe the term "as broadly as possible"). And, like the clauses held overbroad in *BluSky*, Section 3(b)'s overbreadth is compounded by the fact that it defines "Confidential Information" to include information that VitalConnect collects from "third parties" without limitation, *see* Agreement § 3(b), "extend[ing] far beyond the confidential

information that [Matrazzo] would have access to" related to Novant, *see BluSky*, 2026 WL 599148, at *12; *see also Fortiline, Inc. v. McCall*, No. 2024-0211, 2024 WL 4088629, at *4-5 (Del. Ch. Sept. 5, 2024) (holding confidentiality, non-compete, and non-solicitation covenants overbroad where they covered confidential information to which defendants were not exposed).

Ultimately, the overbreadth issues the Court has identified "present[] the probability that a restrained party could unknowingly breach the covenant." *Fortiline*, 2026 WL 4088629, at *4. Delaware courts have expressed concern with confidentiality clauses that are vague and poorly tailored, especially when they reach information far beyond the information the former employee may have encountered during his employment. *See Hub Grp.*, 2024 WL 3453863, at *7, *11; *BluSky*, 2026 WL 599148, at *12. As the Court's questioning of VitalConnect's counsel at the hearing underscores, *see* Hr'g Tr. at 67:24-71:3, it is difficult to discern the precise limits of Section 3(b)'s broad definition of Confidential Information. Coupled with Section 3(a)'s potentially indefinite length, there is a real threat that Matrazzo could unknowingly breach Section 3(a) through innocuous conduct many years into the future. These concerns make Section 3(a)'s confidentiality covenant unenforceable.

**III. The Court Will Not Blue Pencil the Overbroad Covenants at This Time.**

The Court declines to discretionarily exercise its authority to blue pencil the covenants at this preliminary stage. The Delaware Supreme Court has suggested that it

may be inappropriate to blue pencil a covenant when resolving a motion for a preliminary injunction. *See C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1054 (Del. 2014); *see also Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 & n.106 (Del. 2024) ("*Sunder II*") (en banc) (observing that *C & J Energy* disapproved of blue-penciling at the preliminary injunction stage because it can deprive a party of bargained-for benefits on a provisional record). Guided by *C & J Energy*, other federal courts have declined to blue pencil overbroad covenants at the preliminary injunction stage. *See, e.g.*, *E. CR Acquisition Inc. v. DeLuso*, 759 F. Supp. 3d 772, 791-92 (E.D. Mich. 2024); *Huber Res. Corp. v. Olson*, No. 1:23-cv-410, 2024 WL 3486430, at *9 (D. Me. July 19, 2024). *But see Cynosure LLC v. Reveal Lasers LLC*, No. 22-11176, 2022 WL 18033055, at *10-11 (D. Mass. Nov. 9, 2022) (blue penciling non-compete covenant in order resolving preliminary injunction motion after all parties agreed court had authority to do so). Beyond *Cynosure*, where the parties conceded the district court's authority to blue pencil, VitalConnect does not furnish to the Court a single case post-*C & J Energy* condoning blue penciling at the preliminary injunction stage. *See Worley*, 429 F. Supp. 3d at 160-61 (blue-penciling restrictive covenant governed by Delaware law at summary judgment); *Cameron Int'l Corp. v. Abbiss*, No. H-16-2117, 2016 WL 5394312, at *4 (S.D. Tex. Sept. 27, 2016) (granting defendant summary judgment prior to ruling on plaintiff's preliminary injunction after concluding that restrictive covenants were unenforceable under Delaware law, but reserving question of reformation to subsequent preliminary

injunction hearing); *see also Del. Express*, 2002 WL 31458243, at *13 (predating *C & J Energy*); *WebMD Health Corp. v. Dale*, No. 11-5827, 2012 WL 3263582, at *7, *11 (E.D. Pa. Aug. 10, 2012) (same).

In any event, the blue-pencil authority is a "discretionary power" this Court declines to exercise at this time. *See Sunder II*, 332 A.3d at 490.[9] Delaware courts have repeatedly warned against haphazard blue penciling. *See, e.g.*, *id.* at 489-90; *Labyrinth*, 2024 WL 295996, at *23; *FP UC Holdings*, 2020 WL 1492783, at *8. This Court does not consider it appropriate to engage in "a wholesale reformation" of the Agreement's covenants or "rewrite the persons to whom the [c]ovenants appl[y] and the type of conduct they restrict[]" this early in the lifecycle of the parties' dispute. *See Sunder II*, 332 A.3d at 490. As the Court's discussion of the three covenants' overbreadth underscores, reforming the covenants would involve potentially extensive rewrites. The Court declines to engage in such large-scale reform at this preliminary stage.

---

[9] Contrary to VitalConnect's argument that the Agreement's "express modification clause … weighs strongly in favor of blue-penciling," *see* Dkt. 64 at 7, such a stipulation cannot influence this Court's decision whether to blue pencil, *see Fortiline*, 2024 WL 4088629, at *4 ("When the policy against unreasonable restraint on trade calls a court to strike a covenant and decline to blue pencil it, the court is unhindered by a provision in that same uneven agreement that purports to promote blue penciling."); *Cleveland Integrity*, 2025 WL 658369, at *11 n.146 (restrictive covenant's "purported mandate to blue-pencil if part of either Restrictive Covenant is held to be unenforceable" was irrelevant); *see also Kodiak*, 2022 WL 5240507, at *5-7.

The Court emphasizes, however, that by declining to blue pencil the covenants, it does not take a stance on Matrazzo's alleged breaches, past or present. VitalConnect has shown—and Matrazzo largely does not dispute—that he contacted Wearlinq about a job prior to leaving VitalConnect, sent the Agreement to Wearlinq's attorneys to review its restrictive covenants, connected Wearlinq to Novant physicians not long before Novant announced a new trial with Wearlinq, and then joined Wearlinq after emailing himself allegedly proprietary information about VitalConnect and its relationship with Novant. That conduct may very well have constituted breaches of the covenants if they were enforceable. But that fact does not alone justify reforming the covenants, as VitalConnect suggests. *See* Hr'g Tr. 114:15-116:23. As the Delaware Supreme Court has explained, "Whether a court should blue pencil a covenant cannot turn on the egregiousness of the employee's conduct." *Sunder II*, 332 A.2d at 490. Were it any other way, "employers [would] be less incentivized to craft reasonable restrictions from the outset," instead relying on the fact "that even the most unreasonable covenants will be enforced if an employee's conduct is sufficiently flagrant." *Id.* To the extent that blue penciling may be appropriate in this case, this Court will do so at a later stage of the proceedings. *Cf. Worley*, 429 F. Supp. 3d at 160-61.

**CONCLUSION**

VitalConnect fails to demonstrate it is likely to succeed on the merits of its breach-of-contract claim against Matrazzo because the Agreement's restrictive covenants are

overbroad and unenforceable under Delaware law. The covenants' significant overbreadth counsels against blue penciling at this preliminary stage. The Court therefore **DENIES** VitalConnect's motion for a preliminary injunction. *See* Dkt. 4.

It is **SO ORDERED**.

This the 25th day of September, 2026.

LINDSEY A. FREEMAN
UNITED STATES DISTRICT JUDGE